Bryan E. Lessley, OSB No. 92081
Assistant Federal Public Defender
859 Willamette Street, Suite 200
Eugene, OR 97401
*Bryan_Lessley@fd.org*
(541) 465-6937 (telephone)
(541) 465-6975 (facsimile)

Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 6:11-CR-60062-AA |
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION TO SUPPRESS FRUITS OF ILLEGAL SEARCH AFTER TRAFFIC STOP** |
| **THOMAS WILLIAM CORNELIUS, JR.,** | |
| Defendant. | |

    The defendant, Thomas Cornelius, moves to suppress all evidence obtained, both directly and indirectly, as a result of the search of his vehicle after a traffic stop on May 3, 2011. Mr. Cornelius believes this suppression would include all of the evidence obtained by the government in this investigation and prosecution.

    The basis of the motion to suppress is that police officers unduly delayed writing him a traffic ticket for approximately twenty-five minutes in order to conduct investigation

unrelated to the purposes of the traffic stop. A delay of this length of time in processing the ticket, in order to conduct other investigation, constitutes an illegal warrantless seizure of Mr. Cornelius in violation of the Fourth Amendment. *United States v. Mendez*, 476 F.3d 1077, 1079-1080 (9th Cir. 2007); *United States v. Turvin*, 517 F.3d 1097, 1100-1103 (9th Cir. 2008). While the police may, during the course of a traffic stop, ask questions unrelated to the reasons for the stop in order to conduct other investigation, such questions or other investigation may not unreasonably delay the duration of the stop. *Id.*

1.  **Factual Basis**

The underlying facts are made apparent from the computer dispatch records, audio and video recordings of the stop, audio recordings made by the dispatcher, and the written report of the officer. At 2:49:16 p.m. on May 3, 2011, Senior Trooper Jo Gardiner of the Oregon State Police observed three cars traveling at a high rate of speed on Highway 101, southbound, in the vicinity of Winchester Bay, Oregon. She turned around, activated her signal lights, and gave pursuit. Two of the cars stopped. One of the cars was a white Cadillac bearing Oregon license number 102 CBJ. The other, which stopped in front of the white Cadillac, was a red Dodge Challenger bearing Washington license plate ACE 5554. Mr. Cornelius was the driver and sole occupant of the Dodge Challenger.

The exact time of the ensuing events can be pinned down fairly precisely. Within a very few minutes, Trooper Gardiner had fully processed the traffic stop as it related to Mr. Cornelius.

The video from the Trooper's car shows that she approached the Cadillac first, at 2:51.02 p.m. She stopped there only briefly, reaching Mr. Cornelius' car by 2:51.26. According to Trooper Gardiner's report, and as shown by the audio recording, she first asked Mr. Cornelius for his license and paperwork. When Mr. Cornelius gave her the driver's license, he admitted that he had been speeding, but he thought he was going closer to 70 miles an hour rather than 89. For purposes of this Motion, Mr. Cornelius does not contest that there was probable cause to believe that he was committing a violation of the basic rule (VBR) and that, therefore, there was probable cause to stop his vehicle.

The events afterward, however, give rise to suppression of the evidence later obtained. According to Trooper Gardiner and the audio recording, Mr. Cornelius, at the time he gave her the driver's license, told her that the car he was driving was an Enterprise rental. He told her that he had left his paperwork at the motel, which was the Edgewater Motel in Seattle, and that he had gone there to visit his girlfriend before she flew to South Africa. He told her that the address on the driver's license was incorrect, but that he had notified the Department of Motor Vehicles of his correct address. He rummaged around in a bag on the seat of the car in an attempt to find the proper address.

In the same conversation, Trooper Gardiner asked Mr. Cornelius if he had ever been arrested. He said that he had been arrested before and that his arrests included Felon in Possession of a Firearm and Robbery I. He said that he was on probation or parole and that he had standard or usual conditions of supervision but no mandatory stipulations. Trooper

Page 3 - Defendant's Motion to Suppress Fruits of Illegal Search After Traffic Stop
O:\Client\Cornelius_Thomas_W_EU201100171_BEL\Pleadings\FPD_Final\Supress_Fruits_of_Stop_Mot_BEL.wpd

Gardiner notes in her report that "I found this unusual, as most individuals on parole have a variety of stipulations they are to follow." Trooper Gardiner's report also says that she asked him if he had anything "in him, on him or in the vehicle he should not have and he replied that he did not." Her report then states "I asked Mr. Cornelius, Jr. if I would find anything if I looked and he said 'No.'" The audio recording also shows that he told her his federal probation officer was Scott Lewis.

All of these questions and answers are audible on Trooper Gardiner's audio recording, which ceased to work after these exchanges. None of the remaining events were captured on Trooper Gardiner's sound recording, though the video recording device in her patrol car continued to work.

Trooper Gardiner's report then says that she returned to her patrol vehicle and ran a check on the subjects. The videotape shows that she left his car at 2:54.36 p.m., stopped at the Cadillac for approximately one minute, and went back to her patrol car at 2:55.50. The dispatch records show that, at 2:55:43 p.m., Trooper Gardiner reported Mr. Cornelius's Oregon Driver's license number to dispatch. Seconds later, at 2:55:51 p.m., Trooper Gardiner sent to dispatch the driver's license number of the driver of the Cadillac.[1]

The dispatch audio shows that the dispatcher determined that Mr. Cornelius' license was valid, that Mr. Cornelius was on post-prison supervision for Robbery I with no

---

[1] The dispatch time records and the time shown on the video from Trooper Gardiner's car do not match exactly. There seems to be only about 30 seconds, difference, however. This difference is not significant to the issues here.

Page 4 - Defendant's Motion to Suppress Fruits of Illegal Search After Traffic Stop
O:\Client\Cornelius_Thomas_W_EU201100171_BEL\Pleadings\FPD_Final\Supress_Fruits_of_Stop_Mot_BEL.wpd

stipulations, and that he was a potential armed career criminal. The dispatcher reported all of this to Trooper Gardiner. The exact time at which this information was conveyed to the Trooper is a little unclear because the dispatch tape does not include exact times. However, records show that it must have occurred before 2:57:53 p.m. This is because the next action taken by Trooper Gardiner was not to write his traffic ticket, but to call for backup. The dispatcher sent out Trooper Gardiner's request for backup. It was responded to by Unit 3373 at 2:57:53 p.m. In other words, sometime between 2:55.51 and 2:57.53, the dispatcher had told Trooper Gardiner that the information Mr. Cornelius had given about himself and his parole status was essentially correct, and that he had a valid license. The dispatcher also told Trooper Gardiner that Mr. Cornelius was a potential armed career criminal.

Having heard that, rather than conclude the stop by writing the ticket, she called for a backup officer. According to her report, her next step after calling for backup was to reapproach his vehicle. According to her report:

> After this information was garnered, Mr. Cornelius, Jr. was re-contacted and told he was not free to leave.
>
> I gave Mr. Cornelius, Jr. this order because I intended to issue a 'VBR citation' to him. In addition, I believed the suspect was involved in criminal activity and as such further investigation was warranted.

The video shows her returning to Mr. Cornelius's car and having this brief conversation at 3:01.01. The backup officer is also seen on the video at this time. Thereafter, Trooper Gardiner, rather than write Mr. Cornelius his ticket, processed the other driver, including

putting him through lengthy field sobriety tests. She arrested the other driver at 3:15.45. By 3:19.28 she had placed him in the back of her patrol vehicle.

Only then did she return to Mr. Cornelius. Notwithstanding that the purposes of the stop had been completely effectuated, except for writing the ticket, she reapproached his vehicle at 3:21.00, with the other officer accompanying her. Her report says that Trooper Gardiner asked Mr. Cornelius to exit his vehicle and return to the patrol vehicle. Mr. Cornelius exited his vehicle at 3:22.06.

Trooper Gardiner's report does not explain why Trooper Gardiner felt it necessary to remove Mr. Cornelius from his vehicle and bring him back to the patrol vehicle in order to write him a ticket for speeding.[2] At that time, she had already gained all the information she needed to write the ticket, including his admission that he had been speeding, along with the fact that he had a valid driver's license and had given her honest answers about his legal status. According to Trooper Gardiner's report, when she brought Mr. Cornelius back to the vehicle she also used that occasion to ask him:

> During this time I also asked Mr. Cornelius, Jr. if he had anything in his vehicle which he should not, such as knives, guns, hand grenades, drugs, etc.,

---

[2] This is not a situation, as in *Pennsylvania v. Mimms*, 434 U.S. 106, 111-112 (1977) where the officer asked the driver to step out of the car in order to perform a pat down for weapons. That explanation cannot work because Trooper Gardiner had already left him sitting in his car for 25 minutes after learning that he was a potential armed career criminal, so there was no basis for performing a pat down search after that passage of time. Moreover, when she asked him to step out of the car, she did not pat him down, but rather took him back to her patrol car while Trooper Brandon searched the Dodge Challenger.

> all of which he denied. I then, in substance, asked Cornelius, Jr. if he minded if I looked and he said 'no,' agreeing that I could. Trooper Brandon, who was assisting me, heard the consent given by Mr. Cornelius, Jr.
>
> Cornelius, Jr. then accompanied me back to my patrol vehicle while Trooper Brandon searched the rental vehicle.

Trooper Brandon searched the car while Trooper Gardiner stood with Mr. Cornelius at the front of her vehicle. The video shows her working with papers during that time, including what appears to be her citation book. Trooper Brandon found two firearms in the trunk of the car, which he reported to her at 3:28.43. Thereafter Trooper Gardiner and Trooper Brandon arrested Mr. Cornelius. Those two firearms are the basis of Counts 17 and 18 of the Superseding Indictment, and led to the initiation of this investigation. That investigation, all of which followed from the traffic stop and the discovery of the guns, resulted in more guns being attributed to Mr. Cornelius, which are the basis of Counts 1-16 of the Superseding Indictment.

The sequence of events, then, is that by 2:57:53 p.m., Trooper Gardiner had gained all of the information she needed in order to write Mr. Cornelius a traffic ticket. Rather than do so, she delayed the stop in order to seek backup because she had been told that Mr. Cornelius was a potential armed career criminal and she wanted to investigate further. After the backup officer arrived, she then processed the other driver. Even after finishing that, rather than write the ticket, she asked Mr. Cornelius to accompany her back to her patrol vehicle while asking for consent to search his vehicle. When this happened at 3:22.06, fully

25 minutes had passed since she had finished gathering all the information she needed from him, and after all of his information, including the validity of his license, had been confirmed by the dispatcher.

2.  **The Delay of 25 Minutes Before Writing Mr. Cornelius's Ticket, In Order to Facilitate The Investigation Of Other Potential Crimes, Violated The Fourth Amendment.**

If the police have probable cause to make a traffic stop, they may ask questions unrelated to the purpose of the stop so long as such questioning does not unduly prolong the driver's detention. *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *Mendez*, 476 F.3d at 1080. However, prolonging a stop in order to conduct investigation unrelated to the original reasons for the stop constitutes a warrantless seizure in violation of the Fourth Amendment. The Supreme Court stated in *Muehler* that "Mere police questioning does not constitute a seizure" so long as the stop is not "prolonged beyond the time reasonably required to complete" the mission for which the stop was made. *Muehler*, 544 U.S. at 101; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The Ninth Circuit quoted this language in *Mendez*, holding that

> "mere police questioning does not constitute a seizure" unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop

*Mendez*, 476 F.3d at 1080.

Until a recent series of cases, including *Mendez* and *Turvin*, the rule appeared to be that police questioning unrelated to the purposes of the stop could not lengthen the stop even slightly. *Cf.*, *Caballes*, 543 U.S. at 407 (unlawful if "prolonged beyond the time reasonably

Page 8 - Defendant's Motion to Suppress Fruits of Illegal Search After Traffic Stop
O:\Client\Cornelius_Thomas_W_EU201100171_BEL\Pleadings\FPD_Final\Supress_Fruits_of_Stop_Mot_BEL.wpd

required" to effectuate purposes of stop); *Muehler*, 544 U.S. at 101 (questioning did not extend the time defendant was detained); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (other inquiries must not "measurably extend the duration of the stop").

*Mendez* and *Turvin* have slightly altered that rule so as to allow the other questions to delay the length of the stop slightly, so long as the overall length of the stop remains reasonable. But the extension of the length of Mr. Cornelius's stop was not reasonable, even given this slight expansion of the doctrine.

*Mendez* was the first indication that minor delays in the length of the stop may be allowed. In *Mendez*, one officer processed the stop while the other asked questions of the driver which were unrelated to the stop. The officer who processed the stop finished that work and approached the driver, overhearing the last part of the other officer's discussion with him. This caused the officer to ask two follow-up questions, resulting in a confession that there was a firearm in the car. The Ninth Circuit held that asking those two questions did not "unnecessarily" prolong the traffic stop, noting that the entire chain of events lasted eight minutes, which was not unreasonable for a traffic stop. *Mendez*, 476 F.3d at 1079-1080.

*Turvin* discusses the same issue of slight lengthening of the stop. In *Turvin*, the officer paused during the ticket-writing process because the officer had been told that the driver had been previously involved in a rolling methamphetamine laboratory. While asking the driver about that information, the officer saw a speaker box in plain view, which the

officer asked to search. Consent was given and the officer found a sawed-off shotgun and a small cup containing methamphetamine. *Turvin*, 517 F.3d at 1098-1099. As the Ninth Circuit noted, the entire duration of the stop in *Turvin* was 14 minutes. More precisely, the officer processed the stop diligently for about ten minutes before being given the information about the rolling methamphetamine laboratory. *Turvin*, 517 F.3d at 1098. The Ninth Circuit held that the brief pause in the ticket-writing process, lasting no more than a small number of minutes, was not unreasonable under *Muehler*, in no small part because the total length of the stop was only 14 minutes which was "no longer than an ordinary traffic stop could reasonably take." *Turvin*, 517 F.3d at 1101.

Thus the Ninth Circuit added a small amount of "reasonable time" in which the officers can prolong a stop to conduct other investigation. The cases cited by *Turvin* from various Circuits all support the notion, explicitly stated in *Turvin*, that any such extension must be for a very brief duration. *See United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007) (questioning that does not "appreciably" extend the duration of the traffic stop is reasonable); *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007) ("de minimis exception justifying brief questions"); *United States v. Childs*, 277 F.3d 947, 953-954 (7th Cir. 2002) (*en banc*) ("not necessary to determine whether the officers' conduct added a minute or so to the minimum time in which these steps could have been accomplished"). Other cases both before and after *Turvin* continue to support the view that any expansion of the length of the stop in order to ask unrelated questions must necessarily

be very brief. *United States v. Purcell*, 236 F.3d 1274)(11th Cir. 2001)(extension of stop for unrelated questions must be de minimis); *United States v. Macias*, 658 F.3d 509, 518-519 (5th Cir. 2011)(unrelated questioning which extends the stop "by some length of time" violates Fourth Amendment); *United States v. Guijon-Ortiz*, 660 F.3d 757 (4th Cir. 2011)(officer cannot abandon the prosecution of the traffic stop and embark on another sustained course of investigation)

The pause by the officers in Mr. Cornelius's case was not de minimis, nor was it "a minute or two." Before 2:57:53 p.m., as noted above, Trooper Gardiner had learned that Mr. Cornelius had presented a valid driver's license and had given honest answers to his status as having been convicted of Robbery I, being on parole, and having no parole stipulations. There was nothing left for Trooper Gardiner to do relating to the traffic stop except write the ticket. Instead, she called for backup, having been told that Mr. Cornelius was a potential armed career criminal. Not until after that backup arrived, and after she processed and arrested the other driver, did she reapproach Mr. Cornelius. Instead of presenting his ticket to him and sending him on his way, she asked him to leave his car and accompany her to her patrol vehicle. There was no reason to have done that; the purposes of the stop were concluded and she did not need to ask him back to her vehicle just to write his ticket. The purpose of doing so was to allow the backup officer to search his car. Even under *Mendez* and *Turvin*, this delay of 25 minutes was not a "de minimis" expansion of the traffic stop and the guns found in his car need to be suppressed.

3.     **All Of The Government's Evidence Relating To The Other Counts Must Be Suppressed As The Fruits Of The Illegal Search.**

Following Mr. Cornelius's arrest, police officer seized his cell phone from his property, obtained a search warrant, and found incriminating pictures of firearms, including Mr. Cornelius holding what appears to be one of them. The officers also intercepted his jail phone calls, which led to further investigation uncovering his relationship with Shaun Cambelik, Larry Sanborn, and others. In the absence of the jail phone calls, Mr. Cornelius's relationship with them would not have come to light. Questioning of those people, which expanded into questioning of others, led to the government's belief that Mr. Cornelius had been in possession of other firearms. These firearms are the subjects of counts 1-16. There can be no question that the government's discovery of this line of investigation was the direct result of Mr. Cornelius being arrested following the traffic stop and the search of his car.

The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of government misconduct to evidence derived from the illegal conduct, or "fruit of the poisonous tree." *Nardone v. United States,* 308 U.S. 338, 341(1939); *Wong Sun v. United States,* 371 U.S. 471, 485 (1963); *United States v. Washington,* 490 F.3d 765, 774 (9th Cir.2007). There are three exceptions, none of which applies here: the "independent source" exception, the "attenuated basis" exception, and the "inevitable discovery" exception.

The "independent source" exception operates to admit evidence that is actually found by legal means through sources unrelated to the illegal search. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392 (1920). Independent source evidence is not "fruit of the poisonous tree" because its discovery through independent legal means does not result from the official's illegal conduct. This is not true here. None of the government's evidence derives from an independent source.

The "attenuated basis" exception applies when the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality. *Wong Sun,* 371 U.S. at 488 (noting that the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint"). This exception is applied more generously when the challenged derivative evidence is live-witness testimony than when it is documentary evidence. *United States v. Ceccolini,* 435 U.S. 268, 278 (1978). It is also inapplicable here.

The "inevitable discovery" exception, adopted by the Court in *Nix v. Williams,* 467 U.S. 431 (1984), allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means. *Id.* at 444. This doctrine requires that "the fact or likelihood that makes the discovery inevitable arise from circumstances other than those

disclosed by the illegal search itself." *United States v. Boatwright,* 822 F.2d 862, 864–65 (9th Cir.1987). This doctrine also has no application here.

## CONCLUSION

In point of fact, every item of government evidence against Mr. Cornelius derives from the unlawful search of his vehicle after the officers unduly prolonged the stop in order to perform investigation unrelated to the speeding violation. All of the evidence must be suppressed.

This the 14th day of June, 2012.

/s/ Bryan E. Lessley
Bryan E. Lessley
Attorney for Defendant